UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
MARTIN HODGE,
                                  :
              Plaintiff,
                                  :    REPORT & RECOMMENDATION
         -against-
                                  :    10 Civ. 428 (PAC)(MHD)
DR. WLADYSLAW SIDOROWICZ,
MR. LYNN LILLEY, DR. TIMOTHY       :
WHALEN, DR. CARL J. KEONINGSMANN,
DR. LESTER WRIGHT, and MR. PEDRO   :
DIAZ,
                                  :
              Defendants.
----------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/2/10

TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:


     Plaintiff Martin Hodge, an inmate at the Sullivan Correctional

Facility in the New York State correctional system, has filed a

complaint under 42 U.S.C. § 1983, alleging that for many years he

has been denied proper or prompt medical treatment during his

confinement. Specifically, he alleges in great detail that he was

denied adequate pain medication for his back pain, was prevented

from or delayed in seeing several specialists recommended during

the course of his treatment for his back problems and eye problems,

was denied certain treatments for his medical conditions and given

others only after unreasonable delays, was repeatedly left without

medication due to the incompetence or deliberate indifference of

prison medical personnel, and was denied a double mattress, in

1

Dr. Carl Keonigsmann, also a Regional Medical Director at DOCS; Dr. Lester Wright, Deputy Commissioner and Chief Medical Officer at DOCS; and Pedro Diaz, a Regional Health Services Administrator at DOCS.

Mr. Hodge originally filed his complaint with prison authorities on November 30, 2009, but at some point he supplemented it with additional exhibits dated as late as February 15, 2010.[2] Since the record reflects neither when Hodge supplemented his complaint nor any objection by the defendants to the additions, the court takes the presence of the additional exhibits as a de facto motion to amend. Finding no prejudice to the defendants by the amendment, we grant the motion, thus permitting a full resolution of Mr. Hodge's claims, which is in the interest of justice. See Fed. R. Civ. P. 15(a)(2).

Defendants have moved under Rule 12(b) to dismiss on several

---

this case. It appears that the extent of Mr. Lilley's involvement in this case is responding to Hodge's request for a double mattress in 2009.

[2] Defendants' Motion to Dismiss refers to the Complaint "with its accompanying Exhibits #1-43." (Def. Mem. of Law in Support of Motion to Dismiss, p. 2). Plaintiff has submitted a total of 46 exhibits, and an examination of Exhibits 44-46 shows that they contain no documents dated before December 14, 2009 or after February 15, 2010.

grounds. They argue that the entire complaint is barred by the Eleventh Amendment, that plaintiff fails to state a claim under the Eighth Amendment, that they are protected by qualified immunity, and that plaintiff's claims are barred in part by the statute of limitations.[3] Defendants also moved to stay consideration of this case while a related previous case was pending, citing the doctrine of collateral estoppel. Since then, a report and recommendation has been issued in that case, see Hodge v. Perilli, 2010 WL 2910158 (S.D.N.Y. July 12, 2010), and the report and recommendation has been adopted by order dated September 30, 2010. Hodge v. Perilli, 2010 WL 3932368 (S.D.N.Y. Sept. 30, 2010). We therefore deny the motion to stay.

For the reasons that follow, we recommend that the motion to dismiss be granted in part and that the complaint be dismissed, in part with prejudice and in part without prejudice to filing an amended pleading.

---

[3] Notably, defendants have not moved to dismiss on the ground that plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act of 1995, 42 U.S.C. 1997e. Failure to exhaust is an affirmative defense which must be pleaded by the defendants. Jones v. Bock, 549 U.S. 199, 216 (2007). Defendants mention exhaustion in their motion (see Defs.' Mem. of Law at 8), but never argue that Hodge failed to exhaust. Hence we consider this defense waived. See Fed. R. Civ. Pro. 8(c).

The Relationship Between Hodge's Two Lawsuits

As a preliminary matter, we note that this is not the first lawsuit that plaintiff has filed over the medical treatment provided during his incarceration. Mr. Hodge filed a similar suit against doctors at Sing Sing Correctional Facility in 2006. See Hodge, 2010 WL 2910158, at *1 (S.D.N.Y. July 12, 2010). In that case, he alleged that his medical treatment had violated the Eighth Amendment in much the same way as his treatment at the Sullivan Correctional Facility. See id. at *6, n. 7. On July 12, 2010, we recommended that the defendants in that case be granted summary judgment, id. at *16, and on September 30, 2010, the District Court adopted our Report & Recommendation, stating that Hodge's "case is frivolous and has burdened the scarce resources of this court for too long." Hodge, 2010 WL 3932368, at *12 (S.D.N.Y. Sept. 30, 2010).

The claims at issue in that case covered only plaintiff's stay at Sing Sing and did not include events post-dating his transfer to Sullivan in March of 2004. In Hodge's current lawsuit, the earliest event referenced in his complaint is his transfer to Sullivan (Compl. at p. 3 ¶ 1), and it accordingly appears that there is no overlap between the two cases.

5

In the first lawsuit, Mr. Hodge did move to amend his complaint in September and October of 2007, seeking in part to add claims against Dr. Sidorowicz for treatment at Sullivan. Hodge v. Perilli, 2008 WL 141093, at *1 (S.D.N.Y. Jan. 7, 2008) (granting in part and denying in part motion to amend complaint). We denied his motions to add new claims against Dr. Sidorowicz, stating that the amendment would be futile since it failed to allege a plausible claim of an Eighth Amendment violation. Id. at *2-*3, *5. Plaintiff filed a motion to reconsider this last decision, which we denied by endorsed order on November 7, 2008. See Hodge v. Perilli, 2009 WL 37522, at *1 (S.D.N.Y. Jan. 7, 2009). In that order, we suggested that if Mr. Hodge wished to sue Dr. Sidorowicz, he should file a separate lawsuit. This suit followed.


Plaintiff's Complaint


As noted, plaintiff offers a lengthy pleading of numerous complaints relating to his medical needs at the Sullivan Correctional Facility, though, as a pro se litigant, he does not label the claims that he asserts. Liberally reading the complaint, however, we readily identify the bulk of his claims as arising under the Eighth Amendment, as they are intended to demonstrate the denial of medical care or its inadequate and delayed provision. In

6

addition, to the extent that he also complains about the alleged failure of prison authorities to grant requested accommodations for his eye and back problems, he may be seeking to assert claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), and possibly the Rehabilitation Act, 29 U.S.C. §§ 701 et seq.[4] To the extent that defendants' motion may be read as addressing the pleading adequacy of each form of claim,[5] we summarize the allegations pertaining to these theories in turn.

I. The Eighth Amendment Claims

Plaintiff came under Dr. Sidorowicz's care when he was transferred to Sullivan Correctional Facility in March of 2004. (Compl. at p. 3 ¶ 1). His complaints about Dr. Sidorowicz's care concern two treated ailments: first, the denial of proper care and requested surgery to correct vision problems resulting from a childhood eye infection and incipient glaucoma; and second, the denial of pain management and requested surgery to correct back

---

[4] Indeed, at one point in the complaint, Mr. Hodge mentions that he filed a "grievance complaining that he was not getting his reasonable accommodations under the ADA . . . ." (Compl. at p. 3G ¶ 45).

[5] Defendants address the Eighth Amendment standards but not those under the ADA or the Rehabilitation Act.

pain resulting from herniated discs and the resulting nerve damage.
He also complains that he was denied the use of a second mattress,
a treatment for his back pain that had previously been allowed him
and that was the subject of an earlier Article 78 proceeding in
state court.

For the sake of clarity, we will detail each of plaintiff's
medical issues -- and his treatment for them -- separately. We base
our summary on the allegations of the complaint and the voluminous
medical and other records that Mr. Hodge has submitted as exhibits
and supplements to his initial pleading.[6]

A. Plaintiff's eye care

Plaintiff's eye problems began when he was thirteen years old,
with a childhood bout of chicken pox. (Pl. Ex. 1). He has had
multiple reconstructive surgeries to his right eye and the
surrounding area in an apparently unsuccessful attempt to repair
damage resulting from this infection. (Id.). As a result, he is
legally blind in his right eye. (Pl. Ex. 35). His vision in his

---

[6] In assessing a Rule 12(b)(6) motion, we will look not only
to the allegations of the pleading, but also to exhibits annexed
to or incorporated in the complaint. See, e.g., ATSI Commc'ns,
Inc. v. Shaar Fund Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

left eye is 20/80. (Compl. at p. 3F ¶ 40). He also suffers from glaucoma, although it is unclear from his complaint exactly when this condition became apparent. (Pl. Ex. 3, 13).

   In June of 2006, plaintiff underwent another surgery on the eye and attended a follow-up appointment a few days later. (Compl. at pp. 3-3A ¶¶ 3-4). He was told to return for a second follow-up with the same doctor -- Dr. Stasior -- two weeks later, but was not sent for that appointment until August 17, 2006. (Id. at p. 3A ¶5; see also Pl. Ex. 2, 3). This is his earliest complaint about the quality of Dr. Sidorowicz's care. According to Mr. Hodge's own letters, however, it appears that only one week after his first follow-up appointment, he was sent to see a glaucoma specialist at the Coxsackie Clinic. (See Pl. Ex. 3, Letter from plaintiff to Sharon Lilley, Nurse Administrator, Sullivan Correctional Facility, July 23, 2006). At one of these appointments, plaintiff's prescription for eye drops was changed from Celluvisc to Systane. (Id.). Plaintiff did not receive Systane eye drops until August 9th or 10th, since the facility had to order the drops from the local pharmacy. (See Pl. Ex. 3, Letter from plaintiff to Sharon Lilley, Aug. 3, 2006; Letter from Sharon Lilley to plaintiff, Aug. 8, 2006). He had similar trouble ordering replacement eye drops the following year. (Pl. Ex. 11).

9

Plaintiff saw Dr. Stasior again on August 17, 2006, and was referred to Dr. Simmons, a glaucoma specialist who had performed the July operation. (Compl. at p. 3A ¶ 5; Pl. Ex. 2). Plaintiff did ultimately see a glaucoma specialist on November 16, 2006, but it was not Dr. Simmons. (Pl. Ex. 5). Plaintiff requested an appointment with Dr. Simmons several times, and was ultimately told that in order to do so, he would need to follow prison procedures for a "Provider of Choice." (Pl. Ex. 3, Letter from S.J. Lilley, Nurse Administrator, Sullivan Correctional Facility, to Martin Hodge, Dec. 20, 2006). Nothing in the complaint or attached exhibits suggests that plaintiff ever attempted to follow this procedure, but he continued to make visits to several eye doctors, including cornea and glaucoma specialists. (Pl. Ex. 5.) At one of these visits, on January 5, 2007, he was sent to see the wrong doctor in an apparent scheduling error. (Id.; see also Pl. Ex. 4).

Plaintiff's cornea specialist told him at one point that he was willing to perform a cornea transplant, but could not do so unless plaintiff's glaucoma was under control. (Pl. Ex. 6, Letter from plaintiff to Sharon Lilley, Jan. 24, 2007). Thus, when Dr. Sidorowicz reduced the frequency of use of plaintiff's prescription eye drops on January 23, 2007, he was understandably upset, assuming that this would slow his recovery from glaucoma and delay

10

or prevent the transplant operation. (Id.)

Mr. Hodge's glaucoma specialist, Dr. Ghandam, recommended that plaintiff undergo surgery for his glaucoma at appointments in September and December of 2007. (Pl. Ex. 12, 16). In between these two appointments, plaintiff filed a grievance stating that he was not being sent back out to see specialist doctors in a timely fashion and lambasting Dr. Sidorowicz's incompetence in scheduling. (Pl. Ex. 12).[7] Plaintiff was originally scheduled for the recommended surgery in January of 2008, but the laser machine used for the surgery broke before he could receive it. (Pl. Ex. 16, 17). Ultimately, plaintiff received laser surgery for his glaucoma on March 17, 2008. (Pl. Ex. 17). In the intervening weeks, plaintiff submitted several formal complaints about the delay. (See, e.g., Pl. Ex. 14-17).

Plaintiff's final complaint relating to his eye care deals with his repeated requests for a procedure called keratoprosthesis, essentially a transplant of an artificial cornea. (See Pl. Ex. 35). Plaintiff's cornea specialist referred him for this procedure in

---

[7] When plaintiff filed this grievance, he was also working through the grievance process for a complaint regarding his referrals to outside specialists for back pain. See infra pp. 17-18.

11

2007, but Dr. Sidorowicz denied the referral in January of 2008, stating that plaintiff "was not a candidate for either PK or keratoprosthesis." (Compl. at p. 3F ¶ 40, Pl. Ex. 34). A different cornea specialist referred him for the procedure later in 2008, but Dr. Sidorowicz again denied the procedure. (Compl. at p. 3F ¶¶ 40-41). The procedure was ultimately the subject of some disagreement between Dr. Sidorowicz and the referring specialist, and plaintiff filed several grievances over Dr. Sidorowicz's refusal to order the procedure at the specialist's behest. (Id. at p.3F ¶¶ 41-42; Pl. Ex. 33-35). On September 13, 2009, plaintiff wrote letters to defendants Whalen and Kenonigsmann, requesting that they overrule Dr. Sidorowicz and order the procedure. (Compl. at p. 3F ¶ 42). In response, Hodge received a letter, dated October 21, 2009, from defendant Pedro Diaz, the Regional Health Services Administrator for NYS DOCS, responding on behalf of Drs. Whalen and Keonigsmann. This letter stated that "the American Academy of Ophthalmology has not established guidelines for either a temporary or permanent keratoprosthesis and considers this procedure to be a rare, last resort for treatment to prevent loss of the eye." (Pl. Ex. 35). On October 23, 2009, presumably after receiving this letter, plaintiff wrote to Brian Fischer, the Commissioner of NYS DOCS, and related the story of his attempts to obtain approval for the keratoprosthesis. (Id.). Defendant Lester Wright wrote back on Mr.

12

Fischer's behalf, in a letter dated November 6, 2009, which is practically word-for-word identical to the October 23 letter from defendant Diaz. (Id.).

Exhibits submitted as part of plaintiff's supplemental complaint show that he had already received two cornea transplants for his right eye, and that the failure of those implants was a factor in the facility medical staff's refusal of a third procedure. (Pl. Ex. 43). In fact, plaintiff's medical records show that he has been listed since 2004 as "not a candidate for surgery" on his eye, and that "[a]ll surgery on his eye w[as] unsuccessful in the past." (Id.). They also show that the keratoprosthesis procedure is only indicated in the absence of "end-stage glaucoma", although they do not reflect the current stage of plaintiff's glaucoma. (Pl. Ex. 35). On November 25, 2009, plaintiff wrote another letter requesting approval of the keratoprosthesis procedure to Mr. Fischer, and sent a nearly-identical letter to Governor David Paterson. Perhaps presuming that these letters would be no more successful, plaintiff filed this suit on November 30th.

B. Plaintiff's back treatment

Plaintiff was diagnosed with a herniated disc in 2001. (Pl.

13

Ex. 7, Grievance Letter from Martin Hodge, July 31, 2007). Upon his arrival at Sullivan Correctional Facility in 2004, Dr. Sidorowicz prescribed "pain injections", which were to be administered as often as every three months, as needed, for Mr. Hodge's back pain. (Id.). In an effort to prevent himself from becoming dependent on the injections, plaintiff chose to have them once a year instead. (Id.). Plaintiff received the injections in 2004, 2005, and December of 2006. (Id.; see also Compl. at p. 3A ¶ 7).

In January of 2007, Dr. Sidorowicz recommended that Mr. Hodge treat his back pain with oral painkillers instead of injections. (Pl. Ex. 8, Declaration of Wladyslaw Sidorowicz in Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, 06-cv-2480 (S.D.N.Y.)). He made this recommendation because "[t]he back injections have a high level of steroids whose side effects may exacerbate Mr. Hodge's eye condition." (Id. at ¶ 6). Dr. Sidorowicz also stated that he believed that oral pain medication would be as effective in treating Mr. Hodge's pain as the injections. (Id.) Mr. Hodge refused the oral pain medication and continued to request injections. (Id.). On January 22, 2007, Mr. Hodge received a letter from Sharon Lilley, the Nurse Administrator at Sullivan, stating that his pain management "would continue after [his] eye

14

appointments are completed . . . so there is no conflict in clinic appointments." (Compl. at p. 3A ¶ 8; see also Pl. Ex. 4). Mr. Hodge objects to this explanation for the end of his injections, stating that he "did not have that many eye doctor appointments pending" at the time. (Compl. at p. 3A ¶ 8). This could reflect another scheduling error, or it could reflect a misunderstanding on Mr. Hodge's part, since Ms. Lilley's letter may have referred to the conflict between Mr. Hodge's eye treatments and the side effects of the injections.

In April, May, and June of 2007, Dr. Sidorowicz signed forms granting plaintiff medical exemptions from work due to his back problems -- under the exemption, plaintiff was to avoid strenuous exercise and lift no more than five pounds. (Pl. Ex. 24). The exemption was originally for a period of two weeks beginning on April 10, 2007, but Dr. Sidorowicz extended it until May 26, and then again until June 26 of that year. (Id.). In addition, Mr. Hodge received a pass exempting him from all work from June 4 to June 9, 2007. (Id.). On Father's Day, June 17, 2007 -- while he was under doctor's orders to avoid lifting more than five pounds -- the plaintiff injured his back lifting his stepson in the visiting room. (Pl. Ex. 7, Grievance Letter from Martin Hodge, July 31, 2007). In his complaint, he alleges that this injury was "[a]s a

15

result of plaintiff not being returned to see the pain specialist at the next clinic in two weeks as ordered after the December of 2006 pain injections." (Compl. at p. 3-B ¶ 11).

Mr. Hodge went to sick call on June 18, 2007, the day after injuring his back, and asked to see Dr. Sidorowicz. (Id. at ¶ 11). Instead, he was treated by a nurse on staff, who gave him a medical exemption from work for the period of June 17, 2007 to June 23, 2007. (Pl. Ex. 24). He continued to receive work exemptions from nurses on staff in June and July (id.), but re-injured his back on July 8, 2007, carrying legal papers to the visiting room. (Pl. Ex. 7). Plaintiff did not see Dr. Sidorowicz until July 25, 2007. (Compl. at p. 3-B, ¶¶ 11-12). By this time, plaintiff's condition had improved somewhat, though he was still experiencing pain. (Pl. Ex. 7). Dr. Sidorowicz gave him a topical pain patch and referred him to a neurosurgeon, but again refused plaintiff's request for injections to his spine. (Id.). About a week later, on July 30, 2007, plaintiff again went to sick call, asking for a medical exemption from work and from lifting objects; he stated that he had used the pain patch and his "back was feeling better over the weekend," but was concerned about re-injuring his back if forced to lift boxes of food in his job in the prison commissary. (Id.). The nurse on duty -- who is not named in the complaint -- noted that

16

Hodge had repeatedly requested medical attention for his back and suggested that he be admitted to the prison clinic instead. (Id.). Mr. Hodge refused admission to the clinic, stating that he did not wish to miss a scheduled family visit on August 2. (Id.). He alleges in his complaint that the nurse's attempt to admit him to the clinic was "an act of retaliation." (Id.). He also stated, in the same grievance letter over the alleged retaliation and inadequate medical care,

> I am walking fine now after six week [sic] of first injuring my back on June 17, 2007. All I have is pain in my right leg from the herniated disc in my back. The proper thing to do, is to have me avoid lifting any items for another week until the back is healed better.

(Id.).


Dr. Sidorowicz saw Mr. Hodge again in August of 2007, at which time Mr. Hodge refused another pain patch. (Pl. Ex. 8). At the August meeting, Dr. Sidorowicz scheduled Mr. Hodge for a neurological consult and physical therapy, which he later stated was, in his opinion, the best treatment for Mr. Hodge's condition. (Id.). Mr. Hodge saw the neurologist in early September of 2007,[8]

---

[8] The complaint is somewhat confused here. It states that plaintiff saw the neurologist on September 10, 2007, while the attached exhibits state that plaintiff saw the neurologist on September 7 and Dr. Sidorowicz on September 10. (Compare Compl. at p. 3B ¶ 14 with Pl. Ex. 7, 8). The complaint also states that plaintiff was given an EMG test instead of seeing a neurosurgeon

17

while his grievance over his medical treatment after his injury and the nursing staff's alleged retaliation was pending. (Pl. Ex. 7, Central Office Review Committee Report on Grievance Number SUL-17443-07, Oct. 3, 2007). The neurologist performed an EMG test, which showed some nerve damage but minimal progression of the underlying condition. (Compl. at p.3B, ¶ 14; see also Pl. Ex. 8 (Memo from Dr. Sidorowicz to Grievance Committee, Oct. 12, 2007), Pl. Ex. 9-10). Based on those results, Dr. Sidorowicz denied plaintiff's request for pain injections and back surgery and scheduled him for a course of physical therapy. (Pl. Ex. 8).[9] Plaintiff filed a grievance over these referrals, asking for another pain injection and an MRI or referral to a surgeon. (Id.). This grievance was also denied. (Id.).

Before, during, and after plaintiff's course of physical therapy, he received a medical exemption stating that he was not to lift more than fifteen pounds; these passes were granted for the

_____

(Compl. at p. 3B ¶ 14), while the attached exhibits reflect a referral to a neurologist -- perhaps a neurosurgeon -- for testing. (Pl. Ex. 8). Mr. Hodge seems to have assumed that if he was seeing a surgeon, it was for surgery, not testing, and submitted a grievance on that basis.

[9] Again, the complaint and attached exhibits are in conflict on this point. The complaint states that Dr. Sidorowicz initially approved pain injections after the EMG test (Compl. at p. 3C ¶ 16), but the exhibits show that Dr. Sidorowicz repeatedly denied further injections even after the EMG test. (Pl. Ex. 8).

majority of 2008, including the entire first half of the year. (Pl. Ex. 24). After physical therapy proved ineffective, Mr. Hodge was returned to the pain specialist on January 18, 2008. (Compl. at p. 3C ¶ 20). At this appointment, the pain specialist recommended nucloplasty (a surgical procedure), an MRI, and the addition of Ultram, an opiate-based painkiller, to Mr. Hodge's medications. (Pl. Ex. 13). Dr. Sidorowicz scheduled the MRI (Pl. Ex. 14), which took place on February 27, 2008. (Pl. Ex. 17). Plaintiff also saw the neurosurgeon again on April 10, 2008. (Id.). After reviewing the results, Dr. Keonigsmann, the Regional Medical Director, denied the nucloplasty procedure as "investigational" (Compl. at p. 3C ¶ 22, Pl. Ex. 15), and recommended evaluation by a physiatrist and a second opinion from a different neurosurgeon. (Compl. at p. 3C ¶ 22, Pl. Ex. 15, 19). Dr. Sidorowicz conveyed this information to Mr. Hodge in a meeting on April 20, 2008. (Pl. Ex. 19). Plaintiff was understandably upset, and submitted a grievance about what he saw as denial of proper medical care. (Id., Compl. at p. 3D ¶ 26).

Around the same time, plaintiff became incontinent and was scheduled to see a urologist. (Compl. at p. 3D ¶ 27). The urologist determined that Mr. Hodge's herniated disc and the associated nerve problems were causing him to leak small amounts of urine in the morning. (Pl. Ex. 20).

19

On June 20, 2008, while the grievance process was ongoing, Mr. Hodge saw the physiatrist and was scheduled for an appointment with a neurosurgeon. (Id.; see also Pl. Ex. 17, Central Office Review Committee, Response to Grievance Number SUL-17821-08, Sept. 10, 2008). Ultimately, plaintiff received surgery for his back pain -- a laminectomy and foraminotomy -- on December 3, 2008, although he never received the nucloplasty procedure originally recommended, and his surgery did not come before he had filed at least one more grievance about the delay. (See Compl. at pp. 3D-3E ¶¶ 30, 33; see also Pl. Ex. 22, 26).

After the surgery, plaintiff's "pain [was] well controlled." He was able to walk "without difficulty" and did not require any pain medication. (Pl. Ex. 26). During a follow-up visit a month later, the surgeon recommended that plaintiff use a memory foam mattress and receive three months of physical therapy. (Compl. at p. 3E ¶ 34). Plaintiff conveyed these recommendations to Dr. Sidorowicz at their next meeting, on January 12, 2009. (Compl. at p. 3E ¶ 35). Dr. Sidorowicz scheduled a physical therapy evaluation, but denied plaintiff's request for a memory foam mattress. (Id.). Plaintiff saw the physical therapist on January 26, 2009. (Id.; see also Pl. Ex. 28). The physical therapist recommended a shorter course of physical therapy: twice a week for

20

four weeks. (Compl. at p. 3E ¶ 35, Pl. Ex. 28). Plaintiff claims that he was denied even this short course of physical therapy. (Compl. at p. 3E ¶ 35). At a follow-up appointment with the surgeon on April 9, 2009, plaintiff was given the instructions to follow up as needed. (Compl. at p. 3E ¶ 36, Pl. Ex. 28). The surgeon also stated in his report "No P.T. [physical therapy] needed," although he also advised the plaintiff to exercise. (Pl. Ex. 28). After this appointment, plaintiff stated that he did not experience any further back pain until May of 2009. (Compl. at p. 3E ¶ 36).

On May 5, 2009, plaintiff was accused of passing drugs -- the Ultram prescribed for his back pain -- to another inmate. (Pl. Ex. 39). After an adversary process and an appeal, he was sent to the prison's Special Housing Unit ("SHU") on May 26, 2009, as punishment for the infraction. (Id.; see also Pl. Ex. 43 (Central Office Review Committee, Letter Regarding Grievance Number SUL-18676-09, Sept. 16, 2009 ("CORC notes that the grievant received a misbehavior report on 5/5/09 for drug possession and this report was affirmed on appeal."))). The voluminous exhibits submitted by Mr. Hodge show numerous attempts on his part to avoid transfer to the SHU, including filing grievances against the facility nurses alleging that they were refusing him medication or forging his medical records. The exhibits also show that the facility performed

21

an exhaustive investigation of these accusations and found no evidence of malfeasance by the facility staff (Pl. Ex. 39), and that each time plaintiff was informed of this conclusion, he filed yet another grievance regarding the same matter, including a grievance against the grievance process itself. (Id.; see also Pl. Ex. 37). Plaintiff's letters regarding this matter also reflect that the infraction that caused him to be sent to the SHU also reduced his good-behavior credits by six months. (Pl. Ex. 39).

While in the SHU, plaintiff was denied the use of a second mattress. He had been using two mattresses from the beginning of his time at Sullivan until his admission to the SHU as an accommodation that had been made to alleviate the pain from his herniated disc. The mattresses -- and the earlier denials of their use at Sing Sing -- had previously been the subject of both state and federal lawsuits by Mr. Hodge. These suits resulted in a state-court order which, according to Hodge, stated that he be given the use of a second mattress until it was no longer medically necessary.[10] (Compl. at p. 3E, ¶¶ 37-38).

Plaintiff repeatedly filed grievances in an effort to recover

---

[10] Mr. Hodge specifically requests an injunction requiring prison officials to comply with this order. (Compl. at p. 5).

the use of his second mattress, claiming that its loss had resulted
in the instantaneous return of his back pain. (Pl. Ex. 30-32).
Plaintiff included with his submissions the "Health Record Progress
Notes" for his time in SHU. (Pl. Ex. 32). These notes show that he
requested a medical appointment for "pain issues" on May 27, the
day after his admission to SHU. (Id.). They also show that on June
5, 2009, he requested that he be allowed to self-administer pain
medication as needed. (Id.). They do not reflect whether that
request was granted, but the note for June 15, 2009, under the
heading "pain issues," states that plaintiff was "seen on medical
round 6/5/09 and his issue was addressed." (Id.). The notes also
show that plaintiff requested (and was granted) the continuation of
several other medications during his stay in SHU, including his eye
drops, allergy medication, diabetes medication, medication for high
cholesterol, and acne cream. (Id.). They also show that his request
that he be given his eye medication and pain medication for an
outside trip ("OST") was granted on June 17, 2009 (id.), although
his June 26, 2009 request for another cortisone injection was
denied. (Id.).

In response to plaintiff's grievances about the denial of a
second mattress, Dr. Sidorowicz stated that Mr. Hodge's medical
condition did not outweigh the security concerns raised by having

23

two mattresses in the SHU. He reiterated this conclusion in the Health Record Progress Note for July 7, 2009 (Pl. Ex. 32), and one of the facility nurses repeated this in a letter to plaintiff on July 8, 2009. (Pl. Ex. 30). Not satisfied with this response, plaintiff wrote two more letters to defendant Lynn Lilley on July 8, 2009 (id.), and one to defendant Lester Wright on July 9, 2009, asking for the return of his second mattress and alleging that he had been "in agonizing pain" during his entire time in the SHU as a result of its denial. (Pl. Ex. 31). A notation in his medical files, dated July 10, 2009, states that he "[m]ay have [a] double mattress if [it is] OK with security." (Pl. Ex. 32). Lilley repeated Dr. Sidorowicz's denial in a letter dated July 14, 2009, apparently reflecting once again the security concerns associated with a second mattress in SHU. (Pl. Ex. 30; see also Hodge, 2010 WL 3932368, at *4 (detailing security risks of mattresses in the prison setting)). On July 21, 2009, defendant Pedro Diaz wrote a response to plaintiff's letter to Wright, essentially reiterating the response from defendants Lilley and Sidorowicz and stating that plaintiff should address his medical concerns through the facility's sick-call procedure. (Id.).

   Mr. Hodge claims that the lack of a second mattress while he was in SHU resulted in the aggravation of his back condition, and

24

that on July 27, 2009 he felt shooting pain in his back and legs that was so severe that he immediately collapsed to the floor of his cell. (Compl. at p. 3F ¶ 39). The prison filed Health Record Progress Notes for Mr. Hodge for July 28, 29, and 30, as well as an "Inmate Injury Report" on July 29. (Pl. Ex. 32). While the Injury Report is mostly illegible, it does reflect that Mr. Hodge was not admitted to the facility hospital or sent to an outside hospital. (Id.). The Health Record notes for July 29 state that plaintiff "reported an injury to l[eft] hand due to back problems & legs giving out . . . ." (Id.). They also state that there were no visible injuries noted on an examination of Mr. Hodge's hand, and that he was given ice; in the following day's record, detailed notes with an unfortunately illegible signature state that Mr. Hodge's hand had "no evidence of edema, bruises or injuries, full ROM [range of motion], [and] good hand grip and flexion." (Id.). The record also reflects that Mr. Hodge was offered an x-ray of his hand and refused it. (Id.). A follow-up examination on August 11, 2009, after Mr. Hodge was returned to general population in the prison, stated that there was "no medical evidence to continue" examining him for any hand or wrist injuries. (Id.). The unsigned notes from this examination state that Hodge was "familiar with [a] home exercise routine and was able to run [one] cycle of McKenzie

25

exercise[s]"[11] and that he was "standing and walking without any difficulties." (Id.). They later state that physical therapy was "not indicated now." (Id.). The August 11th notes further state that Hodge requested that he be given a prescription allowing him to self-administer pain medication because he "ha[s] pain occasionally and he doesn't need med[ication]s daily." (Id.).

Plaintiff continued to file grievances about his extra mattress, which were resolved when he was released from SHU and issued a second mattress on August 31, 2009. (Id.). Despite the return of his requested mattress, plaintiff claims that sudden, shooting back pain caused him to fall again on October 11, 2009. (Compl. at p. 3F, ¶ 39; Pl. Ex. 42).

Plaintiff's final complaint about his back problem is actually a complaint about the facility's heat. He alleges that the heat in his cell was not working, in violation of New York law, and that

---

[11] McKenzie exercises are a form of physical therapy specifically aimed at the lower back and often prescribed to treat lumbar pain. See Mikel A. Rothenberg, M.D., PREPARING ORTHOPEDIC DISABILITY CASES § 2.01 (Aspen Publishers, 2006); see also Cimino v. Perrill, 166 F.3d 1220 (Table, text in WESTLAW), 1999 WL 14049, at *3 (10th Cir. Jan. 15, 1999) (noting prescription of McKenzie exercises as treatment for severe spinal injury); Sanders v. Comm'r of Soc. Sec., 2008 WL 2704354, at *3 (N.D.N.Y. July 3, 2008) (noting prescription of McKenzie exercises as treatment for back pain).

his grievance about this problem was not addressed. (Compl. at pp. 3G-3H ¶ 49; Pl. Ex. 41). Plaintiff also claims that Sullivan has been having heating problems for ten years (Compl. at pp. 3G-3H ¶ 49), although he has only been at Sullivan since 2004. Plaintiff's exhibits also reflect the fact that, in response to his grievance, facility officials had maintenance staff verify that the heat was working properly in the facility as a whole and in the plaintiff's cell, and recommended that "if [the] heat is not working inmate should be moved to a different cell." (Pl. Ex. 41).

C. Plaintiff's Other Medical Complaints

Mr. Hodge alleges that Dr. Sidorowicz and the nurses on staff would stop his medication without warning or medical reason, or deny him requested medication. (Compl. at p. 3G ¶ 47; see also Pl. Ex. 6, 32, 39, 40). The exhibits attached to his complaint, however, reflect the fact that he was regularly prescribed medications for various ailments, including not only eye drops, but also treatments for pain, allergies, heartburn, anxiety, depression, and high cholesterol. (Pl. Ex. 26, 32, 39, 40). The exhibits show that Hodge submitted several grievances about the suspension of his prescription for trisalicylate, despite being told that the manufacturer no longer made the drug and that Dr.

27

Sidorowicz would provide him with a substitute. (Pl. Ex. 39). Similarly, the plaintiff repeatedly requested that his prescription for Lipitor be resumed, despite the fact it was discontinued due to his complaints of side effects and Dr. Sidorowicz's determination that he no longer required treatment for high cholesterol. (Pl. Ex. 32, 40).

Hodge also alleges that the nurses at Sullivan occasionally marked that he had received medication when he had not. (Compl. at p. 3G ¶ 48). Again, he filed numerous grievances over this matter, beginning with the grievance submitted on May 6, 2009, after he was accused of passing drugs to another inmate. (Pl. Ex. 37, 39, 43).

## II. ADA and Rehabilitation Act Claims

Plaintiff alleges facts that can be construed as a denial of reasonable accommodations for his physical limitations. We have already alluded to his complaint about his demand for a second mattress while he was in SHU; he also alleges that he was denied reasonable accommodations for his poor vision. (Compl. at p. 3G ¶ 45, Pl. Ex. 38, 44). Read with appropriate liberality, these allegations can be interpreted as seeking relief under either the ADA or the Rehabilitation Act, both of which may apply in a prison

28

context. <u>See</u>, <u>e.g.</u>, <u>Shomo v. City of New York</u>, 579 F.3d 176, 185-86 (2d Cir. 2009).

Regarding his vision problem, in Hodge's complaint, he states that he originally submitted a grievance about needed accommodations for this condition in 2007, but that this grievance was lost. (Compl. at p.3G ¶ 45). Plaintiff's exhibits, however, include a reasonable accommodation form, dated July 6, 2007, with plaintiff's signature, showing that he requested large print materials, a magnifying glass, and a cassette player, and was denied these materials because the medical information on file did not show that they were necessary. (Pl. Ex. 38). The exhibits also show that on June 3, 2009, plaintiff was approved to receive sport eye protection, large print, magnifiers, a cassette player with headphones, a lamp, sunglasses, and a "PIT TV" as accommodations for his poor vision. (<u>Id.</u>). The exhibits also show a grievance from January 2010, in which Mr. Hodge requests prescription eyeglasses. (Pl. Ex. 44). A response from the prison authorities shows that Mr. Hodge was scheduled for an optometry appointment as of February 12, 2010, and noted that he had not made a request for the eyeglasses through the reasonable-accommodation process. (<u>Id.</u>).

29

ANALYSIS

Defendants have moved to dismiss Mr. Hodge's complaint on multiple grounds. First, they seek dismissal under either Rule 12(b)(1) or Rule 12(b)(6) based on the contention that Eleventh Amendment immunity divests this court of subject matter jurisdiction because plaintiff is suing the defendants in their "official capacity." (Defs.' Mem. of Law at 9-11). Defendants also move to dismiss under Rule 12(b)(6) on the grounds that Mr. Hodge's complaint fails to state a claim under the Eighth Amendment, or, in the alternative, that he has failed to allege the defendants' personal responsibility for his injuries. Alternately, defendants argue that they are protected by qualified immunity (id. at 18-21), that all of plaintiff's claims pre-dating December 4, 2006 are barred by the statute of limitations (id. at 21-22), that some of plaintiff's claims may be barred by collateral estoppel (id. at 22-23), and that plaintiff's claim regarding the denial of a double mattress does not plead a federal constitutional violation. (Id. at 23-24). Defendants' motion does not address plaintiff's claims insofar as possibly asserted under the ADA or the Rehabilitation Act.

We first address the Eleventh Amendment argument and then turn

30

to defendants' remaining contentions.

A. Eleventh Amendment Sovereign Immunity

Although not a model of precision, defendants' argument in support of their Eleventh Amendment defense appears in two forms in their briefing. First, they assert that the Eleventh Amendment bars suit under section 1983 "against DOCS" and that the complaint must therefore be dismissed under Rule 12(b)(1). (Defs.' Mem. of Law at 7). Second, they seem to argue that the plaintiff is asserting his claims against the individual defendants in "their official capacities," and that therefore this aspect of the complaint must also be dismissed under the Eleventh Amendment. (Id. at 9-11). Both arguments are well wide of the mark.

First, plaintiff has not named the Department of Correctional Services (or DOCS) as a defendant. He has sued only six employees or officials of the agency. Hence the asserted impermissibility of suing a state agency or the state itself is not triggered in the fashion first suggested by defendants.

Second, defendants' alternate argument, premised on the assumption that plaintiff is suing the named individual defendants

31

in their official capacities, is factually inaccurate and, in part, irrelevant. We address defendants' analytical errors in this respect only briefly.

The heart of defendants' reasoning is found in the following assertion: "To the extent that plaintiff's claims against defendants are claims for actions taken by them in their official capacities, such claims are barred because they seek damages allegedly resulting from policies of DOCS (i.e. the state), not from the personal actions of such state officials." (Defs.' Mem. of Law at 11). They elaborate further by stating that to the extent that plaintiff sues the individual defendants for complying "with DOCS policies regarding medical treatment," such claims must be deemed to be asserted "against the state," and so are likewise barred by the Eleventh Amendment. (Id.). Not surprisingly, defendants cite no relevant legal authority for these propositions, and in fact they are not correct.

To assert a claim against a government employee under section 1983, the plaintiff must allege (and ultimately prove) that the defendant was acting "under color of state law," that is, that he was exercising in some way the power of his office. Kentucky v. Graham, 473 U.S. 159, 166 (1985) (citing Monroe v. Pape, 365 U.S.

167 (1961)). Necessarily, then, to state such a claim the plaintiff must in fact allege action by the individual defendant as an official. See, e.g., id.; Johnson v. Goord, 445 F.3d 532, 534 (2d Cir. 2006). If a claim against a state employee based on such conduct by him were barred by the Eleventh Amendment, then no claims could ever be asserted for constitutional torts by state representatives. That is of course not the law.

The Eleventh Amendment bars suits for money damages against a state or its agencies under section 1983. Moreover, a claim for damages asserted against a state employee in his "official capacity" is also deemed to be a claim against the state and hence barred by Eleventh Amendment immunity. See Graham, 473 U.S. at 169; Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100-02 (1984). If, however, the plaintiff asserts a claim for damages against a state employee in his individual capacity, it is not subject to such an immunity defense. See, e.g., Hafer v. Melo, 502 U.S. 21, 27-31 (1991). A claim for damages against a state, county or municipal employee will be viewed as one asserted against him in his individual capacity if it is the plaintiff's intent -- as manifested in the pleading or otherwise -- to seek the relief directly from that individual rather than from the employing government or agency. See, e.g., Davis v. New York, 316 F.3d 93,

33

102 (2d Cir. 2002) (citing Hafer, 502 U.S. at 27-31); Huang v. Johnson, 251 F.3d 65, 70 (2d Cir. 2001); Rodriguez v. Phillips, 66 F.3d 470, 482 (2d Cir. 1995); accord, e.g., Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001).[12]

In this case the complaint makes no reference to any of the claims being against the defendants in their official capacities, and plaintiff confirms in his opposition that he seeks relief against them only in their individual capacities. (See Pl.'s Response at p. 3 ¶¶ 6-7). Hence the Eleventh Amendment does not bar his claims under section 1983.[13]

---

[12] The fact that the state may decide to indemnify the individual defendant if he is found liable does not alter this analysis or change a claim's status from an individual-capacity claim to an official-capacity one. See, e.g., Huang, 251 F.3d at 70 (citing Farid v. Smith, 850 F.2d 917, 923 (2d Cir. 1988)).

[13] Defendants' alternative argument -- in substance, that their alleged adherence to state policy changes the plaintiff's allegations to official-capacity claims -- fares no better. First, plaintiff does not allege that defendants were simply applying state policies, nor does he seek to challenge such policies; all he does allege is that prison officials of varying rank failed to ensure that he received minimally adequate medical care and that they retaliated against him for complaining. Second, we are aware of no legal precedent -- and defendants cite none -- that suggests that alleging that top-ranked state officials pursued an unconstitutional course because of a state policy has the alchemical effect of changing an individual-capacity suit into an official-capacity one. Indeed the law is plainly to the contrary. Third, even if plaintiff was seeking to enjoin state policies without suing the state, the Eleventh Amendment need not bar such an effort, since a plaintiff may seek

Finally, we have recognized that plaintiff's pro se pleading may fairly be read to assert claims under the ADA and Rehabilitation Act. Although defendants do not discuss these claims and hence do not seek to invoke Eleventh Amendment immunity with respect to them, we nonetheless address them here in view of the absence of an explicit identification of these claims in the complaint. We read plaintiff's complaint broadly to encompass claims against the individually named defendants in both their individual and official capacities, since his statement that he was "suing each defendant in his individual capacity" refers expressly to his claims under section 1983. (See Pl.'s Response at p. 3 ¶¶ 6-7). "[N]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." Garcia v. S.U.N.Y. Health Services Center of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001) (citing cases). We therefore analyze the application of the Eleventh Amendment only as to Hodge's potential official-capacity claims under each statute.

---

prospective relief against the state's employees in their official capacities. See, e.g., Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 n. 10 (1989); Edelman v. Jordan, 415 U.S. 651, 676-77 (1974); Huminski v. Corsones, 396 F.3d 53, 70 (2d Cir. 2005); Henrietta D. v. Bloomberg, 331 F.3d 261, 287-88 (2d Cir. 2003) (citing cases); Huang, 251 F.3d at 70 (citing Edelman, 415 U.S. at 676-77).

The Rehabilitation Act was enacted pursuant to Congress's powers under the Spending Clause of Article I. See Garcia, 280 F.3d at 113 (2d Cir. 2001) (citing U.S. Const. art. I, § 8, cl. 1). Thus, it applies only to state agencies that accept federal funds, but Congress may require that states accepting those funds agree to waive their sovereign immunity from suit in federal court. Id. The Rehabilitation Act contains such a waiver, but that is insufficient on its own to permit a finding of a waiver of sovereign immunity without a determination that the waiver was knowingly made. Id. at 113-14. Several recent cases have agreed that New York's continued acceptance of federal funds under the Rehabilitation Act after Garcia constitutes such a knowing waiver of sovereign immunity. See, e.g., Degrafinreid v. Ricks, 417 F.Supp.2d 403, 414 (S.D.N.Y. 2006) (collecting cases); see also Fleming v. State University of New York, 502 F.Supp.2d 324, 334 (S.D.N.Y. 2007) (noting that state agency defendant declined to raise Eleventh Amendment immunity argument against Rehabilitation Act claim). Absent any basis in the current record to reject these holdings, we view Hodge's apparent claim for damages under the Rehabilitation Act as not barred by sovereign immunity.

As for the ADA, the question of when it abrogates state sovereign immunity is not entirely settled. The Supreme Court held

36

in <u>United States v. Georgia</u> that Title II of the ADA[14] abrogates sovereign immunity as to damages actions against the states insofar as the alleged violations of the ADA are also violations of the Fourteenth Amendment.[15] 546 U.S. 151, 158-59 (2006). Since the Eighth Amendment is incorporated against the states, <u>see</u> <u>id.</u> (citing <u>Louisiana ex rel. Francis v. Resweber</u>, 329 U.S. 459, 463 (1947)), Hodge's complaint does not run afoul of the Eleventh

---

[14] Title II of the ADA -- specifically, 42 U.S.C. § 12132 -- is the basis for Hodge's claims, since it prohibits "public entit[ies]" from discriminating against the disabled. This prohibition applies to inmates in state prisons, <u>Pennsylvania Dept. of Corr. v. Yeskey</u>, 524 U.S. 206, 213 (1998), and requires the states to provide reasonable accommodations for prisoners' disabilities. <u>See</u> 42 U.S.C. § 12112(b)(5)(A) (defining "discriminate" for purposes of the ADA to include "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability . . . unless [the public entity] can demonstrate that the accommodation would impose an undue hardship . . . ."); <u>see</u> <u>also</u> <u>Maccharulo v. New York State Dept. of Corr. Servs.</u>, 2010 WL 2899751, at *3 (S.D.N.Y. July 21, 2010) (citing <u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261, 273 (2d Cir. 2003).

[15] The Court did not decide, however, whether the ADA abrogated sovereign immunity as to conduct that violated the statute but not the Fourteenth Amendment. It stated that lower courts considering this question should determine "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." <u>Georgia</u>, 546 U.S. at 159. Since we find that Hodge fails to state a claim for violations of Title II of the ADA (<u>see</u> below at pp. 58-62), we decline to reach the question of whether sovereign immunity bars claims for ADA violations that are not also constitutional violations.

37

Amendment insofar as it may be read to seek damages from the State of New York for ADA violations that are also violations of the prohibition on cruel and unusual punishment. We therefore hold that sovereign immunity is not a bar to Hodge's ADA claims for money damages against the individual defendants in their official capacity, insofar as he alleges ADA violations that are also violations of the Eighth and Fourteenth Amendments, and we therefore decline to recommend dismissal of his ADA claims on sovereign-immunity grounds.

B. Statute of Limitations

Before we discuss the adequacy of Hodge's pleading of his claims, we must address defendants' attempt to dismiss some of plaintiff's claims as time-barred. (Defs.' Mem. of Law Motion at pp. 21-22).[16] Claims under 42 U.S.C. § 1983 are controlled by the state statute of limitations for personal injury actions in the state where the action is brought. Wilson v. Garcia, 471 U.S. 261, 276-80 (1989). In New York, this statute of limitations is three years. Owens v. Okure, 488 U.S. 235, 251 (1989); see also N.Y.

---

[16] Defendants' motion only addresses the statute of limitations as to claims brought under 42 U.S.C. § 1983. See id. at 21. We therefore do not address an unarticulated argument against the other claims that we have discerned in the complaint.

C.P.L.R. § 214(5). Since Mr. Hodge filed his complaint on November 30, 2009, he would be barred from bringing any claims that accrued before November 30, 2006.[17]

The statute of limitations begins to run "when the plaintiff knows of or has reason to know of the harm." Shomo, 579 F.3d at 181 (quoting Eagleston v. Guido, 41 F.3d 865, 871 (2d Cir. 1994). One exception to this general rule is the "continuing violation doctrine," which allows section 1983 claims for time-barred events to go forward when they are part of a "continuous series of events giv[ing] rise to a cumulative injury." Id. at 182 (quoting Heard v. Sheahan, 253 F.3d 316, 320 (7th Cir. 2001)). This doctrine "can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs," so long as the plaintiff "allege[s] both the existence of an ongoing policy of [deliberate indifference to

---

[17] Defendants claim in their motion to dismiss that any claims "pre-dating December 4, 2006" are time barred. Def.'s Mot. to Dismiss at 22. This is presumably because Mr. Hodge's complaint arrived at the courthouse on December 4, 2009. Under the prison-mailbox rule, however, Mr. Hodge's complaint is considered filed when he delivered it to prison authorities to be mailed to the clerk -- presumptively, November 30, 2009, the date that appears in the pleading. See, e.g., Walker v. Jastremski, 430 F.3d 560, 562 n.1 (2d Cir. 2005) (citing Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993)); see also Compl. at p. 7. Three years before November 30, 2009 is November 30, 2006.

his or her serious medical needs] and some non-time-barred acts taken in the furtherance of that policy." Id. We therefore review Hodge's complaint to see if he has alleged a policy of denying him medical care for a serious condition and some action taken after November 30, 2006 in furtherance of that policy, which could indicate a continuing violation that would preserve his claims of violation before that date.

At first glance, plaintiff's complaint appears to date from his transfer to Sullivan in 2004, potentially subjecting some of it to a statute-of-limitations defense. (Compl. at p.3 ¶ 1). Plaintiff's complaints about treatment for his back injury, however, do not begin until after he received his most recent spinal pain injection, in December of 2006. (See id. at p. 3-A, ¶ 7). Similarly, his complaints about withholding of prescriptions, lack of heat in his cell and the failure to accommodate his disabilities do not refer to any actions by the defendants prior to 2007. Thus, on the face of the complaint and its exhibits, none of these claims is time-barred.

Plaintiff's complaints about the treatment of his right eye present a slightly more complicated question. The earliest action of which plaintiff complains is the delay in sending him for

40

doctors' appointments after eye surgery and a referral to a glaucoma specialist, each of which began in July of 2006 and are therefore potentially time-barred. (Id. at p.3, ¶ 2). Plaintiff's allegations of similar violations continue, however, well into 2007. (Id. at p.3-A, ¶ 6, 9-10). Reading his complaint liberally, as we must in this case, we find that to the extent Hodge alleged claims based on events occurring prior to November 30, 2006, he is asserting that they were part of an ongoing policy of "regularly disregarding medical recommendations concerning proper treatment" that continued beyond the limitations date, thus saving these claims from dismissal as time-barred. Cf. Shomo, 579 F.3d at 184-85. Hence we now turn to defendants' contention that Hodge fails to state a claim of Eighth Amendment violations under Rule 12(b)(6).

C. Failure to State an Eighth Amendment Violation

Defendants' primary attack on Mr. Hodge's complaint is that it fails to state a claim that his rights under the Eighth Amendment were violated during his stay at Sullivan Correctional Facility. For the reasons that follow, we agree and recommend granting their motion to dismiss on these grounds.

41

### 1. Rule 12(b)(6) Criteria

The traditional test on a Rule 12(b)(6) motion allows the complaint to survive unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Leibowitz v. Cornell Univ., 445 F.3d 586, 590 (2d Cir. 2006)(quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The Supreme Court recently rejected this formulation, however, and hence "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombley, 550 U.S. 544, 570 (2007)). Under this new "plausibility standard," our analysis requires two steps. "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Iqbal, 129 S. Ct. at 1949) (internal quotation marks omitted). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. (quoting Iqbal, 129 S.Ct. at 1950). We remain obligated to "accept all factual allegations in the complaint as true and draw

42

all reasonable inferences in [plaintiff's] favor." Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2009) (quoting Johnson v. Rowley, 569 F.3d 40, 43-44 (2d Cir. 2009)) (brackets in original). We also must still "construe a pro se complaint liberally." Harris, 572 F.3d at 72 (citing cases)). But we are "not required to draw unreasonable inferences or to credit legal conclusions at odds with plaintiff's own factual allegations." Solow v. Stone, 994 F.Supp. 173, 181 (S.D.N.Y. 1998) (citing De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir. 1996)). And "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- that the pleader is entitled to relief.'" Iqbal, 129 S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

When addressing a Rule 12(b)(6) motion, the court may not consider evidence proffered by either party. Rather, it is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are integral to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. See, e.g., ATSI Commc'ns, Inc., 493 F.3d at 98; Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Leonard F. v. Israel Disc. Bank, 199 F.3d 99, 107 (2d Cir. 1999).

Judicial notice may be taken of the status of other lawsuits and the substance of papers filed in those actions. See, e.g., Anderson v. Rochester-Genesee Reg'l Transp. Auth., 337 F.3d 201, 205 n.4 (2d Cir. 2003) (citing cases).

### 2. Assessment of Plaintiff's Eighth Amendment Claims

#### (a) Eighth Amendment Criteria

The Eighth Amendment "imposes a duty upon prison officials to ensure that inmates receive adequate medical care." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 832, 844 (1994)). To establish a constitutional claim based on the quality of medical care provided by a defendant, an inmate plaintiff must demonstrate "deliberate indifference to [his] serious medical needs." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)) (alteration in original).

This two-part test embodies both an objective and a subjective component. First, as an objective matter, "the alleged deprivation of adequate medical care must be 'sufficiently serious.'" Salahuddin, 467 F.3d at 279 (quoting Wilson v. Seiter, 501 U.S.

44

294, 298 (1991)). "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Id. (quoting Wilson, 501 U.S. at 298) (internal quotation marks omitted). This objective inquiry itself may be split into two parts. First, the court asks "whether the prisoner was actually deprived of adequate medical care." If so, the court next considers "whether the inadequacy in medical care is sufficiently serious." Id. at 279-80. "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." Id. (quoting Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003))(internal quotation marks and brackets omitted).

The second, subjective component of an Eighth Amendment claim requires us to ask whether the failure to render proper care resulted from "a sufficiently culpable state of mind." Id. (citing Wilson, 501 U.S. at 300). This state of mind must reflect "deliberate indifference to inmate health, . . . a mental state

45

equivalent to subjective recklessness, as the term is used in criminal law." Id. (citing Farmer, 511 U.S. at 839-40). Disagreement with a course of treatment chosen by a medical provider does not suffice to demonstrate such indifference. See, e.g., Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998); Sonds v. St. Barnabas Hosp. Correctional Health Serv., 151 F.Supp.2d 303, 312 (S.D.N.Y. 2001). Indeed, even negligence tantamount to medical malpractice does not amount to an Eighth Amendment violation. Estelle, 429 U.S. at 105-06; Chance, 143 F.3d at 703. To be held in violation of the Eighth Amendment, the charged official must "act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Salahuddin, 467 F.3d at 280 (citing Farmer, 511 U.S. at 836-37).

## (b) Evaluation of the Complaint

Mr. Hodge's complaint offers a detailed account of his dealings with Dr. Sidorowicz and several other medical personnel. It refers to numerous instances of the doctor's (and his supervisors') alleged failure to (1) provide the particular form of treatment that plaintiff wished or that was requested by an outside medical specialist, (2) have plaintiff seen by the particular outside physician whom plaintiff wished to see, or (3) arrange for

46

plaintiff to see an outside physician or receive a certain treatment as quickly as plaintiff believed appropriate. These allegations, even liberally construed, simply do not amount to a claim for deliberate indifference, since the denial of an inmate's desired form of treatment is not tantamount to deliberate indifference, and even carelessness amounting to medical negligence does not constitute a violation of the inmate's rights under the Eighth Amendment.

Plaintiff has submitted forty-six exhibits totaling several hundred pages, each of which is referenced, and therefore incorporated, in his complaint. The exhibits show that he was regularly seen by Dr. Sidorowicz and the nurses on staff at Sullivan, was repeatedly referred to medical specialists, received numerous prescriptions and evaluations of his medical conditions, and was ultimately given corrective surgery for both his eye problems and his back condition. He received the pain injections he desired until Dr. Sidorowicz determined that they would aggravate his eye condition, then he received alternative pain medications. As in plaintiff's previous lawsuit, "the fact that plaintiff was regularly examined and treated for his back condition by the medical staff . . . including by [the] defendant, belies any claim of deliberate indifference to his medical needs." Hodge, 2010 WL

47

3932368, at *6 (quoting Hodge, Report & Recommendation, July 12, 2010, 2010 WL 2910158, at *6); cf. Estelle, 429 U.S. at 106-07 (holding that plaintiff who received regular medical treatment failed to state a claim for inadequate medical care). While plaintiff's treatments did not occur as quickly as he may have liked, and did not conform in every respect to outside specialists' recommendations or Mr. Hodge's desires, neither of these complaints, even if true, amounts to a constitutional violation.

Plaintiff's allegations, proffering details related to Dr. Sidorowicz's delay in referring him to outside specialists and denial of his requested treatment in favor of other methodologies, do not plausibly suggest that Dr. Sidorowicz manifested the indifference that is the hallmark of a constitutional claim. Several of plaintiff's complaints amount to nothing more than minor delays in arranging for his desired care. For instance, after an eye operation on June 23, 2006, plaintiff was scheduled for a follow-up appointment. This appointment took place as scheduled, on June 28, 2006. There, "the operating doctor ordered that plaintiff return in two weeks." (Compl. at p.3 ¶ 3). Plaintiff complains that his scheduled return was delayed until August 17, 2006, approximately six weeks later. Similarly, plaintiff sometimes did not receive a new medication immediately upon its prescription

48

because he had to wait up to a month for it to be ordered from an outside pharmacy. (Pl. Ex. 3). These delays are simply not serious enough to rise to the level of a constitutional violation, especially considering that Hodge does not allege that they caused any worsening of his condition. See Smith, 316 F.3d at 187 (stating that "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."). Other delays in plaintiff's treatment, such as the delay of his laser eye surgery from January to March of 2008, were not caused by any of the named defendants (see Pl. Ex.16, 17), and so plaintiff's allegations concerning those events do not state a valid claim for relief against them.

The most serious allegation of delay in plaintiff's complaint is the eighteen months between his back injury in June of 2007 and his surgery in December of 2008, during which time his condition clearly worsened. His submitted exhibits show, however, that during the intervening time he was repeatedly granted medical passes allowing him to avoid lifting objects at his prison job, given prescription painkillers and physical therapy, and referred to several medical specialists who ultimately determined that surgery was the best course of action. (See, e.g., Pl. Ex. 32, 37, 39).

49

Even read liberally, these allegations do not reflect deliberate indifference; they merely show that Dr. Sidorowicz followed a conservative course of medical treatment, seeking to avoid unnecessary surgery by eliminating less invasive options. Moreover, once other options had been eliminated, Dr. Sidorowicz (and Dr. Keonigsmann) approved Hodge for surgery without delay. The surgery was a success, and plaintiff did not complain of back pain again until his stint in the SHU. After he was released from the SHU and his second mattress was returned, he ceased complaining of back pain except for his mention of a fall in October of 2009. (See Compl. at p. 3F ¶ 39). Some time before that fall, he submitted another grievance about his medical treatment; the facility's response, dated December 23, 2009, states that

> [Hodge] was seen by the Physician's Assistant on 10/16/09 and 10/23/09, had lab work done on 11/2/09 and 11/19/09, and was evaluated by his primary care provider on 11/3/09 and 11/12/09. It is also noted that he had consultations with outside specialists, and that he is scheduled for lab tests and additional appointments with his provider and specialists. Medical showers, a memory foam mattress, and physical therapy are not medically indicated at this time.

(Pl. Ex. 39). This ongoing treatment does not reflect deliberate indifference to plaintiff's medical needs.

Plaintiff's complaint regarding the approximately ninety days he was without a second mattress likewise do not state a claim for

an Eighth Amendment violation. As we found in Hodge's previous case, the fact that he was denied a particular type of treatment for back pain -- here, a second mattress -- "does not establish a violation of plaintiff's constitutional rights." Hodge, 2010 WL 2910158 at *6; see also Chance, 143 F.3d at 703; Sonds, 151 F.Supp.2d at 312.[18] Furthermore, the exhibits that Hodge submitted along with his complaint show that he was regularly seen by medical personnel during his time in the SHU and was treated for various ailments, including his back pain (Pl. Ex. 28). This does not reflect deliberate indifference. See Estelle, 429 U.S. at 106-07. Upon his discharge from the SHU in August of 2009, when he had been without his second mattress for nearly three months and his request for a pain injection had been denied, he requested that he be given pain medication to self-administer as needed, stating that he "ha[d] pain occasionally," but that he "doesn't need med[ication]s daily." Moreover, Hodge's final allegation of back pain came in October 2009, over a month after his second mattress was returned to him (see Compl. at p.3F ¶ 39; Pl. Ex. 32), suggesting that what

---

[18] To the extent that Hodge alleges a violation of the Fourteenth Amendment stemming from the named defendants' failure to comply with a state court order requiring that he be provided with a second mattress (see Compl. at p. 3H ¶ 53), he also fails to state a claim on which relief can be provided, since he has no protected liberty interest in a second mattress aside from his right to be free from deliberate indifference to his serious medical needs. See Hodge, 2010 WL 3932368 at *10-11.

pain he did have would not have been prevented by his use of a second mattress. Since Hodge's own exhibits show that the delay in receiving his desired mattress was apparently insufficient to cause serious harm, his allegations do not plausibly represent a sufficiently serious deprivation of adequate medical care to trigger the protections of the Eighth Amendment. See Smith, 316 F.3d at 186.

Similarly, the fact that Dr. Sidorowicz and Dr. Keonigsmann refused to approve Hodge's desired keratoprosthesis procedure does not demonstrate deliberate indifference. Hodge's exhibits show that during the last five years he has had two surgeries on his right eye and has consistently received medication for his glaucoma. (Pl. Ex. 2-6, 17). Again, this comprehensive course of treatment belies a claim of deliberate indifference. Moreover, he had had two previous cornea transplants, both of which ultimately failed. (Pl. Ex. 43). Due to the failure of these procedures, he has been listed as "not a candidate for [eye] surgery" since 2004, and medical records submitted as exhibits to his complaint state that there has been no change in his condition since then. (Id.). While Hodge's outside specialists clearly disagreed with Drs. Sidorowicz and Keoningsmann on this point, since they recommended a third attempt at a cornea transplant, this type of disagreement among physicians

52

does not rise to the level of a constitutional violation. Chance, 143 F.3d at 703.

Hodge has also failed to state a claim that Dr. Sidorowicz denied him medication and physical therapy, in violation of the Eighth Amendment. The exhibits attached to Hodge's complaint show an extensive record of treatments, including prescription of various medications for a myriad of ailments. (Pl. Ex. 26, 32, 39, 40). In fact, a search of plaintiff's cell upon his admission to the SHU found several full and apparently unused bottles of prescription medication. (Pl. Ex. 28). The fact that plaintiff did not receive precisely the prescription or dosage he desired instead of the one his doctor thought was medically appropriate does not give rise to a constitutional claim. See Chance, 143 F.3d at 703. Similarly, plaintiff's disagreement with Dr. Sidorowicz over the necessity of a course of physical therapy following his back surgery does not state a claim for violation of the Eighth Amendment. The neurosurgeon who originally prescribed plaintiff's physical therapy stated at a follow-up visit that no physical therapy was necessary. (Pl. Ex. 28). If the specialist who originally prescribed physical therapy later stated that it was unnecessary, Dr. Sidorowicz can hardly be faulted for not following the specialist's initial recommendation. This kind of disagreement

53

among physicians does not amount to a constitutional claim. See,
e.g., Chance, 143 F.3d at 703; Sonds, 151 F.Supp.2d at 312.

In short, given the specific facts alleged by the plaintiff,
his claims of deliberate indifference are simply not plausible.

Finally, to the extent that Hodge alleges that the facility
nurses were responsible for denying him medication and falsifying
medical records (Compl. at p. 3G ¶¶ 46-48), his complaint fails, if
for no other reason, because he has not named any of the facility
nurses as defendants. See, e.g., Hughes v. U.S. Postal Service, 700
F. Supp. 799 (S.D.N.Y. 1988) (dismissing claim for failure to name
the proper defendant). We also read his complaint liberally to
allege that one of the facility nurses retaliated against him for
his repeated requests for medical care by proposing to admit him to
the facility clinic against his will (Compl. at p. 3B ¶ 12, Pl. Ex.
7), but again, this nurse is not named as a defendant and so this
claim must be dismissed. Cf. Hodge, 2010 WL 3932368, at *7.
Similarly, although Hodge complains that the lack of heat in his
cell aggravated his back condition (Compl. at pp. 3G-3H ¶ 49, Pl.
Ex. 41), he does not allege that any of the named defendants was
responsible for the condition of Sullivan Correctional Facility's
radiators. We therefore recommend that his claims as to the nurses'

54

actions and the problems with Sullivan's heating system be dismissed.

D. <u>Supervisory Liability</u>

Since we recommend dismissal of Hodge's Eighth Amendment claims against Dr. Sidorowicz on the basis that he failed to adequately allege a constitutional violation, we need not address defendants' alternative argument that the complaint fails to allege the personal participation in the constitutional wrongs of Dr. Sidorowicz by the other defendants -- Drs. Whalen, Keoningsmann, and Wright, as well as Mr. Lynn Lilley and Mr. Pedro Diaz. Nonetheless, in the interest of completeness, we find that even if Hodge adequately pled a claim for deliberate indifference, his claim would fail against four of these defendants -- Whalen, Wright, Diaz, and Lilley -- due to their lack of personal involvement in the allegedly wrongful actions.

An individual defendant may not be held personally liable under section 1983 for the wrongs of his subordinates or co-workers absent a showing that he was personally involved in some way. <u>See</u>, <u>e.g.</u>, <u>Iqbal</u>, 129 S. Ct. at 1948. Moreover, as a pleading matter the Supreme Court has recently underscored the stringency of this

55

requirement, noting that a plaintiff seeking to hold a senior government official liable must allege specific facts tending to show that he was personally and actively involved, either by direct participation or by his role in approving an unconstitutional policy or practice. The Court went on to say that a supervisor's failure to act to correct a violation subsequently brought to his attention is not a sufficient basis on which to premise liability if the underlying constitutional tort requires a showing of intent. Iqbal, 129 S. Ct. at 1948-49, 1952 (in rejecting adequacy of supervisory-liability claim, Court relies on rule that a claim of discrimination in violation of equal protection depends on a showing, and pleading, of intentional discrimination by supervisory officials).[19]

However the test is characterized, Hodge's pleading fails to identify any basis for holding any defendant other than Drs. Sidorowicz and Keonigsmann responsible for deliberate indifference to plaintiff's medical needs. The complaint and its attached exhibits show that defendants Lilley, Whalen, Wright, and Diaz had

---

[19] This analysis seems to reflect a partial retrenchment from the standards for supervisory liability previously recognized by the Second Circuit. See, e.g., Iqbal v. Hasty, 490 F.3d 143, 152-53 (2d Cir. 2007), rev'd sub nom. Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

no part in any medical decision-making with regard to plaintiff.
Defendants Diaz and Wright are apparently named in the complaint on
the sole basis that they responded to letters from plaintiff
complaining about Dr. Sidorowicz's care; defendants Lilley and
Whalen may have had more awareness of Dr. Sidorowicz's actions, but
chose not to interfere with his medical decision-making. Under the
rule of Iqbal, liability under section 1983 cannot attach to
involvement as peripheral as this. We therefore recommend that
Hodge's section 1983 complaint be dismissed against these
defendants on this alternative basis, for failure to state a claim.

Dr. Keonigsmann presents a closer question. Reading Hodge's
complaint liberally, we find allegations that Dr. Keonigsmann was
directly responsible for delaying Hodge's back surgery in the
summer of 2008 in order to obtain a second opinion, and that he was
at least somewhat involved in the decision to deny the
keratoprosthesis procedure. As stated above, neither of these
actions was a violation of the Eighth Amendment, but we decline to
recommend dismissal of the complaint against Dr. Keonigsmann on the
alternative ground that he cannot be held liable because of a lack
of alleged personal involvement.

57

E. <u>The ADA and Rehabilitation Act Claims</u>

Defendants have not moved to dismiss what we have discerned as Hodge's claims under the ADA and the Rehabilitation Act, but since these claims were not expressly identified in the complaint, we nonetheless address the adequacy of their pleading here. "Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem." <u>Rodriguez v. City of New York</u>, 197 F.3d 611, 618 (2d Cir. 1999)(citing <u>Lincoln Cercpac v. Health & Hosps. Corp.</u>, 147 F.3d 165, 167 (2d Cir. 1998)).

Although Hodge's allegations under the ADA and the Rehabilitation Act are apparently limited to two requests for reasonable accommodations for his poor vision, <u>see</u> Pl. Ex. 38, 44, we also consider whether his request for a second mattress falls under the rubric of either statute. One of Hodge's requests for glasses and other vision aids was ultimately granted, although it was apparently granted two years after it was originally made. (Pl. Ex. 38). The other was not made as a request for accommodation under the either statute, but was a request for prescription glasses filed as a grievance. (Pl. Ex. 44). Similarly, Hodge's repeated requests for a second mattress during his time at SHU were

58

never phrased as a request for an accommodation of a disability, but were made through the grievance process and at sick-call. (Pl. Ex. 30-32). Assuming that Hodge's grievances were valid requests for accommodations under either statute, and that his requests were denied by one of the named defendants, we nonetheless find that he has failed to state a valid claim for relief and recommend that to the extent that his complaint may be read as asserting ADA and Rehabilitation Act claims, they should be dismissed.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. The Rehabilitation Act contains a virtually identical proscription. See 29 U.S.C. § 794(a).

"To state a prima facie claim under either the ADA or the Rehabilitation Act, which are identical for our purposes, [a plaintiff] must allege" three things. Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009). First, the plaintiff must allege "that []he is a 'qualified individual' with a disability;" second, "that []he was excluded from participation in a public entity's services, programs

59

or activities or was otherwise discriminated against by a public entity;" and third, "that such exclusion or discrimination was due to [his] disability." Id. (quoting Hargrave v. Vermont, 340 F.3d 27, 34-35 (2d Cir. 2003)). The prohibition on "discrimination" under the Acts includes the failure to provide reasonable accommodations for disabled individuals to ensure meaningful access to public services. See Powell v. National Bd. of Medical Examiners, 364 F.3d 79, 85 (2d Cir. 2004); Henrietta D. v. Bloomberg, 331 F.3d 261, 273 (2d Cir. 2003); Felix v. New York City Transit Auth., 324 F.3d 102, 104 (2d Cir. 2003) (quoting 42 U.S.C. § 12112(b)(5)(A)) ("The [ADA] defines 'discriminate' to include 'not making reasonable accommodations [available to a qualified person with a disability] unless [the provider of the service] can demonstrate that the accommodation would impose an undue hardship on [its operations].'"). "The purpose of these requirements is to ensure that services provided to non-disabled individuals are not denied to disabled individuals because of their disability." Maccharulo v. New York State Dept. of Corr. Servs., 2010 WL 2899751, at *3 (S.D.N.Y. July 21, 2010) (quoting Doe v. Pfrommer, 148 F.3d 73, 83 (2d Cir. 1998)). A complaint without allegations of disparate treatment between those with disabilities and those without fails to state a claim under either statute. Id. (citing cases).

60

As to Hodge's request for accommodations for his impaired vision, we assume for purposes of a 12(b)(6) motion that Hodge is disabled and thus a qualified individual under the ADA. See Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566-67 (1999) (stating that whether monocular vision constitutes a disability must be considered on a case-by-case basis). This satisfies the first prong of the prima facie case. Hodge has not, however, satisfied the second prong, since he never alleges that he has been denied access to any prison services, programs, or activities due to the failure of prison authorities to provide his requested accommodation. Without such allegations, his claim must be dismissed. Carrasquillo v. City of New York, 324 F.Supp.2d 428, 443 (S.D.N.Y. 2004) (citing cases); Devivo v. Butler, 1998 WL 788787, at *4 (S.D.N.Y. Nov. 10, 1998) (dismissing ADA claim where "[p]laintiff failed to allege that he was denied the benefit of any . . . prison program, benefit or service because he was legally blind . . . ."). We also note that Hodge's exhibits show that he was given numerous accommodations for his impaired vision, including sport eye protection, large print, magnifiers, a cassette player with headphones, a lamp, sunglasses, and a "PIT TV." (Pl. Ex. 38). He has not alleged that these accommodations were unreasonable, or that they were inadequate to allow him to access prison services.

61

Similarly, even assuming that Hodge's back problems qualify him as a disabled individual under the ADA, he has not alleged that failure to provide him with a second mattress prevented him from accessing prison services. Moreover, he has not alleged that the denial of a second mattress was disparate treatment; that is, he has not stated that other inmates in the SHU were given second mattresses despite the facility's stated security concerns. We therefore recommend that his ADA and Rehabilitation Act claims be dismissed for failure to state a claim.

F. Qualified Immunity

Finally, defendants move to dismiss on the ground that they are protected by qualified immunity. This defense is also argued solely in response to plaintiff's section 1983 claims.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S.Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Under the rule of Saucier v. Katz, 533 U.S. 194 (2001), a court reviewing a claim of

qualified immunity was first required to decide whether the facts
alleged by the plaintiff gave rise to a claim of violation of a
constitutional right, and if it found a violation, to then
determine "whether the right at issue was 'clearly established' at
the time of [the] defendant's alleged misconduct." Pearson, 129
S.Ct. at 815-16 (citing Saucier, 533 U.S. at 201 (2001). Pearson
receded from this holding, allowing defendants to cloak themselves
in qualified immunity "on the ground that it was not clearly
established at the time of the [challenged conduct] that their
conduct was unconstitutional," without requiring the court first to
examine the constitutionality of the conduct itself. Id. at 813.
Since, however, we have already determined that plaintiff has not
alleged a constitutional violation, there is no occasion to address
the defendants' immunity defense.


G. The Nature of the Recommended Dismissal


Only one question remains on this motion: whether the
dismissal of each of Hodge's claims should be with or without
prejudice. While we recommend that a handful of Hodge's claims be
dismissed without prejudice due to his failure to name proper
defendants, we recommend dismissal with prejudice for the bulk of
Hodge's claims.

When addressing a pro se complaint, a district court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated. Thompson v. Carter, 284 F.3d 411, 419 (2d Cir. 2002) (citing Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991); see also Gomez v. USAA Federal Savings Bank, 171 F.3d 794, 795-96 (2d Cir. 1999). However, a court need not permit amendment when, as in much of this case, the complaint gives no indication that a valid claim might be stated. Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003); Gomez, 171 F.3d at 796.

Hodge claims that nurses at Sullivan denied him necessary medication and falsified medical records to cover up this fact. (Compl. at p. 3G ¶¶ 46-48). This kind of deliberate denial of necessary medical treatment, if properly pled, might give rise to a plausible Eighth Amendment claim. See, e.g., Thompson, 284 F.3d at 419 (stating that a prisoner's allegations that denial of his medication lead to his injuries "may [give rise to] a legitimate claim of deliberate indifference to a serious medical condition."). He further claims that prison officials failed to supply adequate heat to the prison facility, and that the cold exacerbated his back condition. (Compl. at pp. 3G-3H ¶ 49, Pl. Ex. 41). These allegations could likewise plausibly state a claim for deliberate

64

indifference. See Powell v. Beilien, 2005 WL 1000040 (W.D.N.Y. Apr. 25, 2005) (dismissing plaintiff's Eighth Amendment claim of inadequate heating without prejudice to his filing an amended complaint alleging "that the lack of . . . heating was sufficiently serious and that the defendant was deliberately indifferent."). We therefore recommend that these claims be dismissed, but without prejudice to Hodge's repleading them to name a proper defendant within thirty days of adoption of this report and recommendation.

Hodge also alleges that a facility nurse attempted to admit him to the facility clinic against his will, in retaliation for his repeated complaints of back pain. We will briefly explicate the standard of review for claims of retaliation in the prison context, in order to explain our recommendation that this claim be dismissed without prejudice.

In order to establish "a prima facie case of First Amendment retaliation, a plaintiff must establish '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) (quoting Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002)). "To

65

adequately plead an adverse action, a plaintiff must allege that defendants subjected him to conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Morales, 278 F.3d at 131 (quoting Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001)) (abrogated on other grounds by Porter v. Nussle, 534 U.S. 516 (2002)). As in his prior lawsuit, Hodge's claims of retaliation here must fail due to his failure to identify who was responsible and name the individual as a defendant. Cf. Hodge, 2010 WL 3932368, at *7. He has, however, stated allegations here that could plausibly give rise to a First Amendment claim, were the correct defendant named. We assume that the speech at issue here -- requests for medical attention -- is protected. See Maxwell v. City of New York, 272 F.Supp.2d 285, 299-300 (S.D.N.Y. 2003) (citing Benitez v. Pecenco, 1995 WL 444352, at *5-*6 (S.D.N.Y. July 27, 1995)) vac. in part on other gds., 380 F.3d 106 (2d Cir. 2004). Moreover, his complaint states that the allegedly retaliatory act was caused by his speech, and that the nurse stated as much. (See Compl. at p.3B ¶ 12, Pl. Ex. 7). While attempting to admit the plaintiff to the prison clinic may not seem to be an "adverse action", Hodge also alleges that the nurse did so in order to prevent him from seeing his family at a visit scheduled shortly after his request for medical attention. (Compl. at p.3B ¶ 12). This type of action could potentially qualify as adverse,

66

depending on the circumstances of clinic admission and whether it would deter the future exercise of his constitutional rights. <u>Cf.</u> <u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000) (holding that administrative segregation of prisoner could constitute adverse action). This claim also has the potential to survive a motion to dismiss, and we therefore recommend that it be dismissed without prejudice to repleading to name a proper defendant within thirty days of adoption of this report and recommendation.

As to Hodge's other claims, however, we recommend that they be dismissed with prejudice. As stated above, his claims of deliberate indifference by the doctors with regard to his medical care are simply not plausible, in view of the extensive details found in the medical records the plaintiff himself has proffered as part of his complaint. Furthermore, his claims under the ADA and Rehabilitation Act must fail, because he has not stated a valid claim for discrimination as defined in either statute, nor do we believe he could on the facts he has alleged.

CONCLUSION

In summary: we recommend dismissal of Mr. Hodge's claims that facility nurses withheld medication and retaliated against him and

67

his claim that lack of heat at Sullivan aggravated his back condition because he has not named a proper defendant. We further recommend that this dismissal be without prejudice, and that he be granted leave to amend his complaint to name a proper defendant for these claims within thirty days of the date of adoption of this Report and Recommendation. We recommend dismissal with prejudice of Hodge's remaining claims, asserted under 42 U.S.C. § 1983, the ADA, and the Rehabilitation Act, because he has failed to state a claim upon which relief may be granted and, given the details of the pleading, he cannot do so.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Paul A. Crotty, Room 735, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C.

68

§ 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: New York, New York
       November 2, 2010


                              RESPECTFULLY SUBMITTED,



                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE




Copies of the foregoing Report and Recommendation have been mailed
this date to:

Mr. Martin Hodge
# 86-A-8851
Sullivan Correctional Facility
325 River Side Drive
Box 116
Fallsburg, New York 12733-0116

Thomas M. Biesty, Esq.
Assistant Attorney General
  for the State of New York
120 Broadway
24th Floor
New York, New York 10271

69